1

1              In the United States District Court
            For the Northern District of Georgia
2                      Atlanta Division

3

Intellectual Ventures
4 II, LLC,

5              Plaintiff,
                                    Civil Action File
6        VS.                        No. 1:13-CV-02454-WSD

7 SunTrust Banks, Inc.,
Et al.,

8
            Defendants.
9

10                          - - -

11       Transcript of teleconference call proceedings

12       Before THE HON. WILLIAM S. DUFFEY, JR.,

13          United States District Court Judge

14                  August 14, 2014

15                  Atlanta, Georgia.

16                          - - -

17

APPEARANCES OF COUNSEL:
18
For the Plaintiff:      Elizabeth Day, Attorney at Law
19                       Marc Belloli, Esq.
                        Zahra Karinshak
20

21 For the Defendants:   Ken Adamo, Esq.
                        Ann Fort, Attorney at Law
22                       Natasha Moffitt, Attorney at Law
                        Eugene Paige, Esq.
23

Reported by:
24      Elizabeth G. Cohn, RMR, CRR
        Official Court Reporter
25      United States District Court
        (404) 215-1573

2

```
 1                    (Thursday, August 14, 2014, 11:05 a.m.)
 2                THE COURT:  Good morning.
 3                MS. DAY:  Good morning.
 4                MS. FORT:  Good morning.
 5                MR. ADAM0:  Good morning.
 6                THE COURT:  I guess it's really a good morning, early
 7     good morning for the people representing Intellectual Ventures,
 8     except for Ms. Karinshak.  I guess it's early out in
 9     California.
10                Do we have Ms. Day and Mr. Belloli on for us?
11                MR. BELLOLI:  This is Mr. Belloli.  We do, Your
12     Honor.
13                THE COURT:  And Ms. Karinshak, are you on?
14                MS. KARINSHAK:  Yes, Your Honor.
15                THE COURT:  And for SunTrust Banks, do we have Mr.
16     Adamo, Ms. Fort, Ms. Moffitt, and Mr. Paige?
17                MR. ADAMO:  Yes, Your Honor.
18                MS. FORT:  Good morning.
19                MS. MOFFITT:  Yes, Your Honor.
20                MR. PAIGE:  Mr. Paige, Your Honor.  Good morning.
21                THE COURT:  This is a call that I've scheduled
22     because of the e-mail that I received on the 28th of July from
23     Ms. Fort in which there is announced that there is a discovery
24     dispute in the case.  And I guess I interpreted it as there
25     being some anxiety about managing the case and conducting
```

1   discovery in light of the pending motion to stay.

2           And now having caught my breath after a pretty busy

3   week, so I thought we could have a discussion about the case.

4   And I want to fill you in on some things that I have been doing

5   in the interim to try to get a handle on, on the management of

6   the case.

7           It is true that there's a pending motion to stay.  It

8   is true that I have not gotten to that.  But I'm just trying to

9   prioritize our work here.  And as you probably know, we have

10  many dockets here these days.  And as of last week, we've lost

11  another district court judge, so we're pretty shorthanded.  And

12  so I'm having to do more prioritization than normal.

13          There are a number of pending criminal cases that I

14  have that have to be tried and those, of course, take

15  precedent.  And I will admit that I have spent a fair amount of

16  time trying to manage those to try to get them in a position so

17  that they can be resolved, including some by trial.  So that's

18  one of the reasons why it's taken me longer than I prefer to

19  get to the pending motions.

20          But before I discuss that and where we are, let me

21  tell you some additional thinking I've had about these cases

22  and the communications I've had with the other courts that are

23  presiding over the other Intellectual Ventures cases.  And,

24  admittedly, I've been the moving force behind those

25  communications and discussions because of this underlying

4

1    concern I have, now having reviewed the chart, that I think

2    either Ms. Day or I thought somebody on the plaintiff's side

3    gave me a comparison of the various cases and what claims were

4    in dispute and how those compared to the claims in dispute in

5    the SunTrust case.  And that was helpful to me.  Whoever

6    provided that, I thank you for that.

7          And then there was a separate chart comparing the

8    construction issues in this case and the various positions and

9    the positions of the two parties in the case.  I'm pretty sure

10   I asked for this, compared that to Judge Hellerstein's claim

11   construction order.  And then if I look at the chart that was

12   provided which was attached as Exhibit A that was sent to me, I

13   think I have a pretty good handle on what, what terms were also

14   at issue in the other cases.

15         And from all of that, it struck me that there was --

16   there are an awful lot of judges across the country

17   interpreting the same terms.  And I think I expressed that in

18   our last conversation.

19         I know Judge Hellerstein.  I've talked to him twice

20   about his case and his status and his management of it and the

21   decisions he's made independent of decisions that others have

22   made but how he got where he got, and so I understand that, and

23   how he's managed his litigation.  But there still is this

24   duplication of judges across the country interpreting exactly

25   the same terms in different stand-alone litigation.

5

1           And I have two philosophical evaluations of that.

2     One is, it certainly is, on a very practical matter,

3     inefficient to have judges across the country in I guess what

4     are now eight cases interpreting the same terms, to the extent

5     that, you know, whoever interprets them first, that that might

6     inform some later judge as how they should be interpreted.  And

7     it helps, I guess, makes it somewhat more efficient.  But just

8     looking at the terms in this case, I'm not sure you're going to

9     have necessarily one judge center position being wholesale

10    adopted by another judge, especially in an area of this where

11    none of us are really well versed or educated in the kinds of

12    technologies that are at issue here.  So I still have this

13    practical efficiency question.

14          The greater concern I have where there's a, where

15    there are patents in dispute, multiple patents in dispute in

16    multiple cases, that it just seems -- I don't know what the

17    right adjective is, but it just doesn't seem to be consistent

18    with what we try to -- with what we try to do as courts to

19    provide consistency and precedential value where you run the

20    risk, as I think we do here, of inconsistent interpretations of

21    exactly the same phrases in a patent.

22          And after our last conversation, which I think part

23    of my fault was that it didn't go especially well, but I tried

24    to drop back and say, what is the best thing to do with respect

25    to these cases to, one, promote judicial economy and to do so

1   in a way that would provide guidance to whatever additional

2   cases are filed on these patents to facilitate a resolution of

3   those without having some later judge say, my goodness, there

4   are four different interpretations of the same phrase and they

5   are all slightly either nuance differences or they are

6   substantive differences.  And those prior opinions and

7   interpretations don't help me one bit.  Certainly doesn't help

8   the parties.

9          So I went back and looked at the Multidistrict

10  Litigation Rules and the Statute and have had a conversation

11  with a member of the Panel, because there is a mechanism by

12  which judges can request the Panel to consolidate cases into an

13  MDL.  But I've not done that yet, although I have talked to all

14  the other judges, and they allowed me to have that conversation

15  with the Panel to get their reaction to what -- how that would

16  be responded to if, in fact, that request was made.

17         So all I've done is, is, is to get intelligence from

18  the Panel as far as what their process would be for considering

19  such a request and had they done it in the past.  And I'll tell

20  you that it's not often done, but it has been done, sometimes

21  successfully and sometimes unsuccessfully.  It just depends

22  upon what the Panel's view is.

23         So while we have that information now and, and we can

24  explore it as an option, I've reported my conversation with the

25  other judges presiding over these cases.  But we -- that's as

1    far as we've gotten, mainly because most of the cases are

2    stayed, and -- with the exception of Judge Hellerstein's, and

3    his is not stayed because he's invested in the case and has

4    moved forward.

5              It has -- actually has no opinion about, about the

6    idea of maybe doing something that would result in a

7    consolidation, however that might occur, but wants me to keep

8    him abreast of what developed in some of the other cases.  And

9    that's how we concluded our last conversation.

10             So that's, that's by full disclosure to you of what

11   I've been doing in working with the other judges behind the

12   scenes to let you know specifically that no decision has been

13   made with respect to anything.  And the one thing that I don't

14   have any control over and where there's been at least one judge

15   who has said it's a consolidation issue make any sense at all

16   and accomplish what I want to accomplish where it would be hard

17   to consolidate now state cases, or at least it would make it

18   less attractive to the MDL Panel.

19             My personal opinion, if I said, oh, by the way, we'd

20   like to consolidate those, but there's only two cases that

21   aren't stayed at the moment -- well, maybe three.  I think that

22   just predicting their response would be, well, doesn't

23   consolidation make more sense after the inter partes review has

24   been to see what, in fact, is yet to be decided and then look

25   at the overlap to see whether there is some more comprehensive

8

1  way in which the terms can be dealt with, whether in some sort

2  of consolidated proceeding.  So --

3      MR. ADAMO:  Your Honor, excuse me for interrupting.

4  It's Ken Adamo from Kirkland and Ellis.  And I believe most of

5  the charts that you were referring to were materials that we

6  put together.  As the Court may recall, Ms. Day and I are both

7  involved in all of the other cases.  I am co-counsel with other

8  firms with respect to the other cases.

9      Is Your Honor aware that Judge Hellerstein ruled on

10  the stay motion a few days ago, the one that was in front of

11  him?

12      THE COURT:  Yes.  He let me know that.

13      MR. ADAMO:  All right.  And the -- that motion and

14  the motion in front of Your Honor were the only two that have

15  not been ruled on so far.

16      The U.S. Bank motion was granted by and stayed by

17  Magistrate Judge Mayeron several weeks ago.  I just wanted to

18  make sure that Your Honor was aware of the status of things in

19  front of Judge Hellerstein.

20      THE COURT:  No.  I'm fully aware of what he's done,

21  and he keeps me abreast of what he's entered.

22      I thought there was one other case where a motion for

23  stay had not yet been made in the Capital One Finance

24  Corporation case.

25      MR. ADAMO:  That's the one that -- yes, that's the

9

1   case that's pending in Southern Maryland recently filed, Judge

2   -- Southern District of Maryland, and Judge Grimm has that one,

3   Your Honor.  That's true, there's been no stay motion filed

4   there.

5           THE COURT:  Okay.

6           MR. ADAMO:  Just to update you a little more on the

7   status of things in front of Judge Hellerstein, a motion to

8   stay that case pending an interlocutory appeal was filed on

9   August 12th.  It's docket number 156 in front of Judge

10  Hellerstein.  And yesterday, notice of interlocutory appeal

11  docket 157 was also filed in front of Judge Hellerstein and, as

12  of this morning, the court in Southern New York has transmitted

13  those appeal papers to the United States Court of Appeals for

14  the Federal Circuit.

15          THE COURT:  Okay.

16          MR. ADAMO:  That's the full status of what is going

17  on in Judge Hellerstein's court at the moment.

18          THE COURT:  So what's the timetable, if anybody can

19  predict it, for the Federal Circuit to decide a motion like

20  that?

21          MR. ADAMO:  There is a recent case, Your Honor, that

22  was just recorded, Virtual Agility in the Federal Circuit --

23  bear with me one second.  I've got the timetable in this mess

24  here somewhere.

25          In Virtual Agility, the appeal from the denial by

1  Judge Gilstrap in Eastern Texas, a stay motion was docketed

2  January 14th of this year.  A motion to stay in District Court

3  and to expedite that appeal was filed in the Federal Circuit on

4  June -- January 22nd, 2014.  The motion to expedite the appeal

5  was granted on January 30th, 2014.  The first brief was filed

6  January 31st, 2014.  The motion to stay in the District Court

7  was granted February 12th, 2014.  And the Panel in appeal

8  2014-1232 handed down a precedential opinion written by Circuit

9  Judge Moore on July 10th, 2014.  So from start to finish, from

10  docket to opinion, Your Honor, it's about six months.

11            THE COURT:  Yeah.

12            MR. ADAMO:  February, March, April, May, June, July,

13  six months, Your Honor.  Docketed January, decision rendered

14  July 10th of 2014.

15            THE COURT:  Okay.

16            MR. BELLOLI:  Your Honor, this is Marc Belloli for

17  Intellectual Ventures.  And the one thing I'd like to add to

18  that is that I.V. would certainly be opposing interlocutory

19  appeal.  It is our belief that, under the statute, they

20  actually don't even have the right to make that interlocutory

21  appeal yet.  So that issue may be resolved sooner than six

22  months, because I think the rights, if they have that right

23  even right now, is certainly -- we know it's a live issue, and

24  that will be resolved even before they get to the merits in the

25  interlocutory appeal, assuming the appeal request that was made

11

1   is even proper.

2           MR. ADAMO:  Your Honor, I don't disagree that we've

3   been informed by some other filings in Judge Hellerstein's

4   court that that's I.V.'s position.  We don't agree obviously at

5   all.  And, yes, I gather what I.V. is saying is that there is

6   going to be early motion practice in front of the Federal

7   Circuit on the point once the appeal is docketed and the

8   decisions are made on motions to expedite, et cetera, which are

9   certainly going to be filed in that appeal.

10          How long a briefing cycle that will take and this,

11  we're sort of off because the statute is new, as the Court is

12  aware, we're off in new terrain here.  How long will it take

13  the circuit to decide that and what kind of briefing cycle

14  they'll set up on that, neither I.V. nor myself can speculate

15  on that.  We just don't know.  We'll do -- obviously we'll do

16  whatever they think is appropriate.

17          THE COURT:  Well, let me circle back to sort of my --

18  the principal concerns I've raised that don't appear to be

19  shared by the parties in this case, which is, if, in fact,

20  there are lots of judges being asked to interpret the same

21  claim terms, what is the -- well, why isn't there more interest

22  amongst you to try to do this in a more global fashion?  And so

23  why are there so many -- is it a lack of willingness?  Is there

24  some economic litigation strategy by having these multiple

25  cases before multiple judges?  Why isn't there more of a spirit

1    of, how can we do this more efficiently and get some resolution

2    so that we can decide where everybody stands with respect to

3    these patents.

4           MR. BELLOLI:  Your Honor, this is Marc Belloli.  And

5    I think, from the plaintiff's perspective, each of these

6    lawsuits were filed.  The defendants -- sometime -- there's

7    been a lot of case law developed over the last few years on,

8    on, on choice of venue.  So there certainly was at one point

9    about putting everyone in Delaware.  We can't put everyone in

10   Delaware, even though most of the folks are incorporated there,

11   but some aren't.  So getting the cases to appropriate venues is

12   the first challenge.

13          And then after that, like you said, there does lack

14   some efficiencies.  But, you know, as a plaintiff, you need to

15   find venue for the defendants first, which is what puts us in

16   the situation that we're in.

17          THE COURT:  Well, do the defendants all like to

18   litigate these separately?  Or is there -- if there was a way

19   to consolidate it, would there be a kind of a sense that that

20   would be an efficient and maybe helpful thing to do?  Or does

21   everybody want to defend these separately.

22          MR. BELLOLI:  This is Marc Belloli again.  I can't

23   speak for defendants, but, I mean, I could see, notwithstanding

24   the inefficiencies of being in the different venues, that, say,

25   the defendant that's seventh in line -- there are seven cases

1    involving these patents -- would like them separated because

2    then they get six cases before them where there's chances for

3    things to go wrong for the plaintiff.  So I can see why certain

4    defendants might want them separately.

5              THE COURT:  Well, why don't we let Mr. Adamo tell us

6    what his reasons are.

7              MR. BELLOLI:  Yeah.

8              MR. ADAMO:  Well, Your Honor, with all due respect,

9    I.V. chose the hand that they dealt.  And that's the hand

10   that's been, that's been played out.  Defendants had nothing to

11   do with that.  And I'm sorry I'm going to have to say this to

12   this Court, but this is a subject, Your Honor, that I'm not

13   authorized even by SunTrust to talk about today.

14             I'm certainly not authorized by the other defendants

15   in the other cases, even though I'm co-counsel, to talk about

16   this with the Court today.  And to the extent these subjects

17   may have been raised, again, I'm sorry, it's with the greatest

18   respect, this would go into attorney-client privilege, work

19   product matters that I am not free to divulge to the Court.

20             I try not to be obstructive here, Your Honor, but I'm

21   afraid I can't contribute much to this particular line of

22   discussion that you're raising, at least so far.  I'm just --

23   for privilege reasons, for work product reasons, but more than

24   anything else, I'm just not authorized to talk about this today

25   because no one expected that this subject was going to come up.

14

1        THE COURT:  I understand.

2        MR. ADAMO:  I am sorry, Your Honor.  I'm very

3   uncomfortable having to tell you this, but I'm constrained to

4   have the discussion.

5        THE COURT:  No, I understand that.  I mean, I've got

6   my own suspicions.  But, but it doesn't, it doesn't move me off

7   my concern that, with as many now Federal District Court judges

8   involved in these cases, that it's sensical to proceed the way

9   that it's proceeding.

10        MR. ADAMO:  Your Honor, one thing that I would --

11   that I would note as you're thinking about this, because of the

12   jurisdictions that I.V. chose to file these cases, some other

13   courts have patent rules, which I know Your Honor is familiar

14   with.  Some don't.

15        Interestingly, Southern New York has patent rules,

16   but, literally, the first day we showed up in Judge

17   Hellerstein's court, Judge Hellerstein announced that we

18   weren't using the patent rules.  He made a decision that, on

19   his discretion, we were not using the patent rules.

20        So instead of a pattern of preset discovery taking

21   place before the Markman claim construction was raised and

22   adjudicated by him, the first thing that was done was, the

23   Markman was done.  So as a result of the selection of these

24   various venues, unusual unexpected things have been happening

25   here.

15

1        Whether that would complicate or drive any decision

2   or views on the various defendant parties in the other cases or

3   in this case, again, I'm not free to discuss that at this time

4   for the reasons I've raised.  But I don't want -- I appreciate

5   I.V.'s counsel's advocacy here.  I don't want Your Honor

6   feeling that staying and litigating on the ground that I.V.

7   chose is driven on the part of any of the defendants to not act

8   in accordance with Rule 1 of the Federal Rules of Civil

9   Procedure or otherwise act in an appropriate ethical manner

10  here.

11       This, this -- I don't want a sense of the pejorative

12  here that somehow, like playing the hand that I.V. dealt, any

13  of the defendants are trying to game the system.  With all

14  respect to everybody on the phone, that's just an inappropriate

15  suggestion.

16       Defendants didn't choose to be sued, and they didn't

17  choose which patents to be sued on, and they didn't choose

18  which venues to be sued in.  That was up to I.V.

19       THE COURT:  Well, the only thing I'll take from this

20  conversation is that I at least know there are two different

21  views of the litigation.  I read between the lines that there

22  must be a huge amount of money at issue, which is why there are

23  various litigation strategies that are being employed.  But I

24  don't have a sense of which -- what they are or whether they

25  are right or not.

1          The only conclusion I reach is just a practical one

2     as one of several judges trying to preside over this, that it's

3     always my interest to find a way, if possible, to promote

4     efficiency and to promote consistency in judicial

5     decision-making.  And, and I guess I will continue to be guided

6     by those two concerns because I think institutionally that's

7     required of me.

8          And I'll say, in communicating with my colleagues,

9     they all share the same concerns that I do.  Sometimes it just

10    takes somebody to poll everybody to see if the concerns are

11    shared.  It's just hard to do that, as I have learned, by the

12    way, by starting this discussion.  It's taken a lot of work and

13    time, and -- but I still think it was the right thing to do.

14    And I wanted you to know it.

15          So -- but as -- I want to make sure everybody

16    understands that all we've done collectively is try to gather

17    information to see what the landscape is to see whether there

18    are options to promote judicial efficiency and consistency in

19    interpretation but that no decisions have been made.  And

20    that's largely the result from the fact that so many of the

21    judges have stayed their cases, which I have not yet done

22    because I really haven't thought enough about it because of my

23    personal docket and things that -- as important as this is to

24    you, there are other people that have to get my time first.

25          So I'm trying to be thoughtful about what I do and

1    when I do it.

2         So the practical issue in this case is, I do need

3    more time before I get to the motion to stay.  But I don't

4    think it makes any sense to require discovery to be conducted

5    when, in fact, if I decided to stay that that discovery might

6    become stale or unnecessary if I were to stay waiting for the

7    result of the inter partes review.  So I think the idea, at

8    least to give me more breathing room and remove from you the

9    burden of spending time and money on discovery that might not

10   be efficient to do right now, would be to, to tell you that you

11   should not conduct discovery in my case until you hear from me

12   on the motion to stay.  And then depending upon what that

13   result is, if it's -- if we move forward, we will have a second

14   conference, either by phone or in person, to decide what the

15   process will be.

16        We do have patent rules.  I've had enough patent

17   cases to have mixed emotions about whether or not I ought to be

18   enslaved to the rules or whether I ought to think more

19   practically about it in each case what makes sense.  But the

20   overall structure of them helps.  I just don't know if I'll

21   say, you know, we're just going to rotely follow the patent

22   rules, because I haven't gotten that far.

23        So let me go ahead and just stay discovery in this

24   case until I rule on the motion to stay.

25        MR. BELLOLI:  Your Honor, Marc Belloli.  If I may,

1  just one point, and then I'm not going to contest Your Honor's

2  ruling on that.  Just one item.

3       There is a deposition tomorrow in this case.  It's a

4  deposition that, you know, both sides are obviously preparing

5  for currently, I think.  And, like you said, in the interest of

6  not duplicating efforts and things like that, you know, if you

7  lift the stay or you don't and stay the case entirely pending

8  the outcome of the RPRs, this deposition would then have to be

9  rescheduled and go forward, so I would request, with Your

10  Honor's permission, just to go forward with that one deposition

11  tomorrow.  I think that makes sense from a class standpoint and

12  an efficiency standpoint as people are already traveling to

13  handle that deposition.

14       MR. PAINE:  And, Your Honor, this is Eugene Paige of

15  Keker & Van Nest representing SunTrust.  We believe that, you

16  know, Mr. Hoff could go and do his own work.  But, you know, it

17  makes sense to allow him to do that.  The lawyers can all go

18  home, and he can have his own job back tomorrow rather than

19  sitting for a deposition and taking time out that might not be

20  necessary.  So we suggest that the stay should enter now and we

21  can let him know he can return to his work duties for tomorrow.

22       THE COURT:  Where is he and where is the deposition

23  to be conducted and who is it?

24       MR. PAIGE:  In Atlanta, Your Honor.

25       THE COURT:  Pardon me?

19

1          MR. PAIGE:  In Atlanta, Your Honor.

2          THE COURT:  And so who would actually be traveling to

3    Atlanta to participate in the deposition tomorrow?

4          MR. BELLOLI:  Counsel for Intellectual Ventures.

5          THE COURT:  And who is that that's going to take it?

6          MR. BELLOLI:  David Rudolph.

7          THE COURT:  And is he actually in Atlanta now?

8          MR. BELLOLI:  I don't know of his actual whereabouts

9    right now.  I don't know if he's already gotten on a plane or

10   not.  I'm not privy to the actual travel schedule.  But I can

11   send him an e-mail right now.

12         THE COURT:  If he hasn't traveled yet, why don't you

13   tell him not to travel.  If he has, SunTrust, if they want this

14   stay, will reimburse him for his travel expense.

15         MR. PAIGE:  Thank you, Your Honor.

16         THE COURT:  It's -- and, Mr. Belloli, my thought is

17   that if there -- whatever happens in these cases, I don't know

18   if he would need to be deposed by others or others would want

19   to participate in it.  I don't know.  Maybe that's a remote

20   idea.  But it seems that -- I would like to put everything on

21   hold until I make my decision.

22         MR. BELLOLI:  That sounds good, Your Honor.  I think

23   the deposition actually is more specific to SunTrust.  But

24   we'll -- I mean, I don't think that's either here nor there.

25   And we'll obviously abide by Your Honor's ruling.

1          THE COURT:  All right.  Anything else that you would

2    like to discuss while we're all together?

3          MR. ADAMO:  Your Honor, it's Ken Adamo again.  Would

4    the Court like us to keep you informed of -- by us, I mean,

5    obviously, Ms. Day and her team, I.V., and the JPMC lawyers --

6    would you like us to keep you advised of what's going on in the

7    interlocutory appeal?

8          THE COURT:  Very much so.

9          MR. ADAMO:  I'll make sure, I'll make sure we, we do

10   that in coordination with I.V., Your Honor.

11         THE COURT:  Okay.  That would help me.

12         All right.  Anything else?

13         MR. PAIGE:  Not from SunTrust, Your Honor.  Thank

14   you.

15         THE COURT:  Mr. Belloli?

16         MS. DAY:  Thank you, Judge.

17         MR. BELLOLI:  Thank you, Judge.

18         MR. ADAMO:  Your Honor, thank you very much for your

19   time.  And thank you very much for your efforts as you related

20   them to us this morning.  We appreciate it.

21         THE COURT:  Well, thank you.  And thanks for being

22   available so that we could hold this call this week.

23         MR. PAIGE:  Thank you, Your Honor.

24         THE COURT:  Thanks a lot.  Have a good weekend.

25         MR. BELLOLI:  You, too, Your Honor.  Take care.

21

1          (Proceedings concluded at 11:40 a.m.)

2                    -   -   -

22

```
1

2

3

4                        C E R T I F I C A T E

5

6    UNITED STATES DISTRICT COURT

7    NORTHERN DISTRICT OF GEORGIA

8

9          I do hereby certify that the foregoing pages are a

10   true and correct copy of the proceedings in the case aforesaid.

11         This, the 15th day of August, 2014.

12

13

14
                             _____
15                           Elizabeth G. Cohn, CCR-B-872
                             Official Court Reporter
16                           United States District Court

17

18

19

20

21

22

23

24

25
```